# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:16-CV-147 (WOB-CJS)

ASHLEY ALLEN                                                    PLAINTIFF

VS.                        <u>MEMORANDUM OPINION AND ORDER</u>

HP ENTERPRISE SERVICES,
LLC                                                            DEFENDANT


This diversity employment matter involves claims of wage-based sex discrimination brought pursuant to the Kentucky Civil Rights Act, K.R.S. § 344 *et. seq*. Ashley Allen ("Plaintiff") alleges that Hewlett Packard Enterprise Services, LLC ("Defendant") compensated Plaintiff's male subordinates and peer managers with higher pay increases throughout the duration of her nearly twenty-year career with Defendant.

This matter is now before the Court on defendant's motion for summary judgment. (Doc. 33) The Court previously heard oral argument on this motion and took it under submission. (Doc. 51), and the parties submitted supplemental memoranda. (Docs. 52, 53). After further study, the Court now issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

1.  **Defendant's Corporate Structure**

Defendant is a multi-national enterprise incorporated in the state of Delaware which provides information technology and solutions to a variety of corporate customers.[1]  Defendant's internal corporate structure is highly-complex creating difficulty in ascertaining where a particular employee falls within the hierarchy of a given work group.  A written and visual representation of this structure follows to aid comprehension of this case's specific facts.

a.  Job Family Group

The job family group is the broadest grouping under which smaller job families fall within Defendant's corporate structure. Examples include: "Services" or "Human Resources."  (Doc. 40-6, PageID# 996, 1044.)

b.  Job Family

A job family refers to specific job divisions within a broader job family group.  In this case, the applicable job

---

[1] About Hewlett Packard Enterprise, https://www.hpe.com/us/en/about.html (last visited May 17, 2018).

family group is referred to as Information Technology Organization ("ITO") Service Delivery.[2] (*Id.* at 1044.)

### c.    Job Categories

Within each job family three general job categories exist. They are:

(1) Support        (2) Professional    (3) Manager

Employees can, and do, transition between each category throughout the duration of their employment. (*Id.* at 1006.)

### d.  Job Category Subdivisions

Each job category subdivides into smaller groups based on the employee's experience, skill set, and decrease in the need for supervision. (*Id.* at 1011.)  Within the ITO Service Delivery job family, job category subdivisions are listed as follows from *least to most* experienced and from *top* to *bottom*:

| Support | Professional | Manager |
|---------|--------------|---------|
| Base | Entry | Supervisor I |
| Primary | Intermediate | Supervisor II |
| Core | Specialist | Manager I |

---

[2] The ITO Service Delivery group provides "expertise for IT infrastructure (e.g. servers, network), ([  ] (SAP)], and related services (e.g. business continuity) throughout the lifecycle of a deal contractually established terms and conditions and established technical standards. (Doc. 40-6, PageID# 1044.)

| Senior | Expert | Manager II |
|--------|--------|------------|
| Advanced | Master | |

e. <u>Corporate Structure Overview (Graphic)</u>



*Job Family Group*:  Services

*Job Family*:  Information Technology Organization Delivery

*Job Categories*:

| Support | Professional | Manager |
|---------|--------------|---------|
| Base | Entry | Supervisor I |
| Primary | Intermediate | Supervisor II |
| Core | Specialist | Manager I |
| Senior | Expert | Manager II |
| Advanced | Master | |

**2.  Defendant's Compensation and Pay Increase Scheme**

Defendant is a "pay-for-performance" enterprise meaning that employees do not receive automatic cost of living or pay increases. (*Id.* at 994.)  Rather, Defendant awards merit increases at its

discretion with job performance being the central criterion for such pay increases. (*Id.*)

The nature of a new employee's hiring dictates what their base salary will be when joining Defendant. If the employee is acquired via merger, Defendant matches the employee's prior salary. (Doc. 40-6 at 1040.) If Defendant hires an employee outside of the merger context, Defendant considers local market conditions, prior experience, and locality pay when establishing a base salary.[3] (*Id.* at 993.)

### a. Pay Bands

Every employee receives a specific job title that corresponds to a job category within a particular job family. Each job title and job category has a salary grade that is broken down into five different pay bands.[4] (*Id.* at 1016.) Hypothetically, an employee could be coded as the following:

---

[3] Although Defendant includes locality pay allocations in determining an individual's base starting salary, subsequent changes in locality may or may not give rise to additional compensation. (Doc. 40-6, PageID# 1020.)

[4] The pay bands, themselves, are determined by looking at competitors' bands and salary ranges. (Doc. 40-6 at 1022.)

| Specific Job Title: | Job Category: | Salary Grade: | Salary Range: |
|---|---|---|---|
| Service Manager | Manager I | M27 | $90,000-150,000 |

The pay bands overlap, but fundamentally work in the following manner:

     i.   Pay Band I: Beginning to 20% of salary range
    ii.   Pay Band II: 20-40% of salary range
   iii.   Pay Band III: 40-60% of salary range
    iv.   Pay Band IV: 60-80% of salary range
     v.   Pay Band V: 80-100% of salary range

(*Id.* at 1017.) Although outliers do exist — with employees falling below Band I or above Band V in particular instances — Defendant makes a concerted effort to pool employees within the middle of Band III. (Doc. 40-1, PageID# 689; Doc. 40-6 at 989.)

      b.  <u>Pay Bands (Graphic)</u>

*Hypothetical Salary Range*: Depending on performance reviews, an employee falling within a $90-150,000 pay range may fall within the following pay bands throughout their employment tenure:



Salary Band I $90-$102,000 | Salary Band II $102,000-$114,000 | Salary Band III $114,000-$126,000 | Salary Band IV $126-$138,000 | Salary Band V $138,000-$150,000

c. <u>Pay or Merit-Based Increases</u>

As noted, employees become eligible for merit or performance-based increases subject to Defendant's funding and internal evaluation process conducted at the end of Defendant's fiscal year - typically in November. The threshold consideration is Defendant's profitability during the preceding fiscal year. (Doc. 40-6 at 1020.) If profits are sufficient, Defendant allocates specific sums for merit-based increases to managers to distribute to their subordinates or direct-reports. (Doc. 40-4, PageID# 895.) These allocations are colloquially referred to as "pots," and each manager possesses full autonomy to allocate the pot among their direct reports.[5] (*Id.* at 896.)

At the same time, managers conduct a performance review of their direct reports. Each direct report is rated on a five-point system as follows:

i.  Significantly Exceeds Expectations



ii. Exceeds Expectations



iii. Achieves Expectations



---

[5] The size of each allocation pot varied between managers based, in part, on that manager's number of direct reports, their experience levels, and gross salaries. (Doc. 40-4 at 932.)

      iv.   Partially Achieves Expectations



      v.   Did Not Achieve Expectations

(Doc. 40-3, PageID# 852-53.)  Direct reports are only compared with members of a peer group to ascertain their performance rating (e.g. Masters are only compared with fellow Masters). (*Id.* at 856).

    Once managers assess their direct reports' performance, calibration meetings occur to determine how to finalize ratings and distribute the merit increase pot in a meaningful manner. (Doc. 40-4 at 928.)  At this point, funds could be transferred between managers' pots to ensure that high performing direct reports on teams with limited budgets could receive an increase commensurate with their performance, especially where those direct reports were at the low ends of salary bands.  (*Id.* at 929.)  To aid their determinations, managers have access to their direct reports' salary data.  Peer data that compare managers to each other are not available.  (*Id.* at 902, 934.)

    Given the interplay between pay band and merit increase system information, direct report employees may earn more than their managers.  For example, a high performing employee with a Professional-coded job at the Master level may earn more than a

similar performing Service Manager coded at the M1 level because Defendant has assessed higher pay bands for Master-level jobs and values a technical skill set over general managerial skills.

   3.  **Plaintiff's Employment**

Between August 1998 and April 2015, Defendant employed Plaintiff in both technical and managerial positions. (Doc. 40-1 at 641.) From 1997-2005, Plaintiff was employed as a Professional-Expert after being outsourced from Proctor & Gamble ("P&G"). (*Id.* at 623.) In this capacity, Plaintiff was responsible for the North American core manufacturing system – P&G's largest and most critical system. (*Id.*) Plaintiff's primary tasks were to manage the system, implement updates where required, fix incidents that arose in a timely fashion, and oversee projects related to core manufacturing. (*Id.* at 647.)

In late 2006 or early 2007, Defendant promoted Plaintiff to a managerial position at the M1 salary grade. (*Id.*) At that time, Plaintiff did not receive a pay increase. (*Id.*) Despite management's pledge that a pay increase was forthcoming, Plaintiff claims that she was never compensated. (*Id.*) In her new position, Plaintiff's primary responsibility was to manage the members of the North America Enterprise Resource Planning ("ERP") team. (Doc. 40-4 at 879.) Specifically, Plaintiff was tasked with completing performance evaluations of team members and resourcing and

staffing direct reports on applicable projects throughout the North American time zone. (*Id.* at 880.) Plaintiff's secondary responsibilities involved escalation management.[6] (*Id.* at 882.) In her escalation role, Plaintiff ensured that the proper direct reports were working on the issue, and she served as an interface between the customer and upper management to keep them informed of the team's progress. (*Id.*) Plaintiff managed between ten and fifteen direct reports. (Doc. 40-1 at 641.)

To highlight the distinction between her positions, Plaintiff has emphasized the managerial nature of her latter role. She indicated that at this point in her career she "didn't do the technical work much at this point, but, obviously, the knowledge that [she] gained was useful in helping manage incident resolution." (*Id.* at 649.) Plaintiff testified that her technical foundation was helpful in understanding the day-to-day work that her direct reports conducted to manage her team effectively. (*Id.* at 645.)

By all accounts, Plaintiff's job performance was sterling under multiple different managers. (Doc. 40-4 at 891.) Plaintiff received a "Significantly Exceeding Expectations" rating every year for ten years during one portion of her employment – a rating

---

[6] Escalations are an information technology term of art referring to outages that require quick response times because the outages are related to business critical functions. (Doc. 40-3 at 831.)

reserved for the top ten to twenty percent of employees. (Doc. 40-1 at 626.) At various unidentified points in her tenure, Plaintiff continually petitioned at least three of her direct supervisors that her salary was not commensurate with her education and experience. (*Id.* at 627.) At some point during these discussions, management acknowledged that Plaintiff was being compensated at the low end of her salary curve and that they would take steps to address this disparity. (*Id.*) These efforts, however, proved fruitless as upper management denied the request for an equitable pay increase on the ground that Defendant did not have sufficient allocations for the raise. (*Id.* at 628.)

In 2011, Plaintiff's learned that multiple male direct reports and several managerial peers were being compensated at higher levels.[7] (*Id.* at 611.) One of those peers, Douglas McKinley ("McKinley"), allegedly performed the same duties and reported to the same supervisor as Plaintiff. (Doc. 40-4 at 883.) Plaintiff was apprised of this information via a spreadsheet transmitted to her via e-mail from Shibu Chakkoria ("Chakkoria"), her direct supervisor, during a ratings and review period. (Doc. 40-1 at 611.) Normally, Defendant only provides managers with their direct reports' salary information, but this spreadsheet included

---

[7] Between 2006-2015, Plaintiff maintains that Defendant compensated her at Pay Band I for her M1 position. (Doc. 40-1 at 633.)

Plaintiff's managerial peers as well.[8]  The record is undeveloped as to whether Plaintiff lodged a formal complaint with human resources or took action beyond the filing of the current lawsuit.

Plaintiff also alleges that her tenure was marked by instances of derogatory gender-based comments supporting a possible discriminatory animus for limiting her compensation.  Plaintiff maintains that middle managers would directly question Plaintiff during leadership meetings concerning her children.  (*Id.* at 629.) These questions routinely concerned setting meeting times between 1:00 and 3:00 P.M., prompting these managers to make derogatory comments about Plaintiff's childcare needs that became something of a running joke among management.  (*Id.*)  Plaintiff also alleges that Bhargava made derogatory comments about Plaintiff's children during a weekend rapid response escalation conference call asking Plaintiff to quiet her children when they were not present.  (*Id.* at 629-630.)  Plaintiff contends that such comments were not directed at male employees who had children.

Unlike her allegations of sex-based wage discrimination, Plaintiff reported her discomfort with these comments to her direct supervisors.  (*Id.* at 634.)  Both Chakkaria and Christian Todd

---

[8] Both Chakkoria and Sumit Bhargava ("Bhargava"), a middle manager, believe that the spreadsheet has been doctored because Defendant would have never provided either of them with salary information regarding their peers since they are not involved in making those pay increase determinations.  (Doc. 40-3 at 843.)

("Todd"), Plaintiff's peer manager at the time, acknowledged that the comments were inappropriate, but they were limited in their response as many of these comments came from their own direct supervisors. (*Id.* at 635-36.) Plaintiff believes that the complaints she lodged against middle management cost her a promotion that ultimately went to Todd despite being told that she would receive that opportunity. (*Id.* at 635.)

Defendant terminated Plaintiff's employment in April 2015 after becoming aware that Plaintiff had concealed her marriage to one of her direct reports in direct violation of Defendant's Code of Business Conduct.[9] (Doc. 33-1, PageID# 133.) At some point thereafter, Plaintiff transmitted the spreadsheet in question to the Equal Employment Opportunity Commission ("EEOC") in connection with a charge of discrimination. (Doc. 40-2 at 808-11.)

In August 2016, Plaintiff filed suit in Boone County Circuit Court, and defendants removed the case to this Court on the basis of diversity jurisdiction. (Doc. 1-1; Doc. 1-3.) Following discovery, Defendant moved for summary judgment on all of Plaintiff's claims.

---

[9] Plaintiff does not challenge the grounds for her termination in this lawsuit.

### *Analysis*

Defendant advances two primary arguments in its summary judgment motion. First, defendant argues that since Plaintiff's sex discrimination claim has been brought pursuant to K.R.S. § 344, the statute of limitations is five years to determine which discrete pay decisions are applicable in this situation. (Doc. 33-1, PageID# 134.) Second, defendant argues that Plaintiff cannot establish a prima facie case of sex-based wage discrimination.

### 1. Applicability of Kentucky Civil Rights Statute and Statute of Limitations

The parties agree that a claim under K.R.S. § 344 is subject to a five-year statute of limitations and that the applicable limitations period in this matter runs from July 25, 2011 (five years prior to the filing of Plaintiff's complaint herein) through April 30, 2015 (Plaintiff's final day of employment).[10] (Doc. 33-1 at 134, 145; Doc. 39-1 at 409.)

The parties do not agree, however, whether it is Plaintiff's individual pay increases or her total compensation which should be analyzed vis a vis her male comparators.

---

[10] Kentucky law indicates that actions "upon a liability created by statute", such as the Kentucky Civil Rights Act, "shall be commenced within five (5) years after the cause of action accrued." K.R.S. 413.120(2).

At the outset, Kentucky law provides scant guidance as to how courts typically address acts of wage-based sex discrimination where allegedly discriminatory pay increases subsequently taint overall compensation figures, creating total wage disparities.

Currently, Kentucky law mandates that "an action for discrimination or retaliation accrues on the date the act of discrimination or retaliation occurs."[11] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002); *see also Walker v. Commonwealth*, 503 S.W.3d 165, 172 (2016) (applying *Morgan's* discrete acts framework under Kentucky law). This rule applies to "any discrete act of discrimination, including discrimination in "termination, failure to promote, denial of transfer, [and] refusal to hire." *Ledbetter*, 550 U.S. at 621 (2007). As in a Title VII case, liability may only arise for discrete acts that occurred within the appropriate time period. *Morgan*, 536 U.S. at 114.

Furthermore, "a new violation does not occur, and a new charging period does not commence, upon the occurrence of

_____

[11] Defendant's argument concerning the application of the *Ledbetter* standard in this case is accurate. K.R.S. § 344 has not been explicitly amended to adopt the provisions of the Lilly Ledbetter Fair Pay Act, Pub. L. No. 111-2, 123 Stat. 5 (2009). Kentucky courts have continued to apply *Ledbetter* as recently as 2016. *See Walker v. Commonwealth*, 503 S.W.3d 165, 172 (2016) (applying *Ledbetter*).

subsequent nondiscriminatory acts that entail adverse effects resulting from past discrimination." *Ledbetter*, 550 U.S. at 628. Yet, "where a plaintiff can establish that the alleged discriminatory act or series of acts constitutes a 'continuing violation,' principles of equity allow the limitations period to run anew from each succeeding discriminatory action."[12] *Walker*, 503 S.W.3d at 172.

Here, it appears that Plaintiff is attempting to rely on non-discriminatory compensation decisions that fall outside of the limitations period to support her current wage-based sex discrimination claim by advancing a "total compensation" argument. (Doc. 39-1 at 409). This theory is not well taken.

First, utilizing total compensation as a discrete pay decision contravenes Supreme Court authority that liability may only arise for discrete acts that occur within the applicable limitations period. *Morgan*, 536 U.S. at 114. Here, Defendant set Plaintiff's base salary in 1998 and this decision created the baseline for the subsequent merit increases she received during her employment. While the 1998 determination, itself, clearly falls outside the five-year limitations period, it became

---

[12] There is no continuing violation in this case. Each of the merit-based pay increases that Plaintiff challenges are "easy to identify" and were distinct in time and circumstance. *Walker*, 503 S.W.3d at 173.

intertwined with later merit increases that Defendant awarded Plaintiff, which resulted in Plaintiff's total compensation. Therefore, since Plaintiff only received merit increases during the limitations period, utilizing her total compensation figures would necessarily encompass the base salary decision made outside the limitations period. Stated differently, the 1998 decision is not a distinct pay decision made during the limitations period.

Second, Supreme Court precedent cautions that courts should not automatically ascribe discriminatory intent to employment decisions other than those about which the plaintiff has specifically made such allegations. *Ledbetter*, 550 U.S. at 628; *see United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977) (declining to take United's discriminatory intent in 1968, when it discharged the plaintiff due to her sex, and assign that intent to its later act of neutrality applying its neutrality system). In other words, if an employer acted with a discriminatory animus at one point in an employee's tenure, it does not mean that it did so on other occasions.

Plaintiff has adduced no evidence that her 1998 base salary determination was motivated by sex-based discriminatory animus. She alleges only that at some point later in her employment she suspected that Defendant was compensating her at lower levels than

her education, experience, and performance reviews warranted.[13]
(Doc. 40-1 at 627.)  Plaintiff's sex-based wage discrimination
suspicions were allegedly only confirmed in 2011 when Plaintiff
came into possession of a spreadsheet showing higher compensation
of male subordinates and peers. (*Id.* at 615.)

Given the Supreme Court's guidance in the area, the Court
concludes that it must use the merit pay increases which occurred
during the limitations period as the discrete pay decisions as the
basis for plaintiff's claim, rather than the total compensation
figures which would include the non-actionable 1998 base pay
decision.

## 2.  Prima-Facie Case of Wage-Based Sex Discrimination

The Supreme Court of Kentucky interprets the Kentucky Civil
Rights Act consistently with its federal anti-discrimination
counterparts. *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492,
495 (Ky. 2005).  In this case, that counterpart is Title VII.  *Id.*
Here, Plaintiff relies exclusively on the *McDonnell Douglas*
burden-shifting scheme.  (Doc. 39-1 at 400.); *see Allen v.
Ingersoll-Rand Co.*, No. 1:96-cv-6-M, 1997 WL 579140 *5 (W.D. Ky.
June 17, 1997) (applying the *McDonnell Douglas* burden shifting

---

[13] Notably, Plaintiff does not argue that she suspected Defendant
was compensating her at lower levels compared to male subordinates
and peers.  Plaintiff simply asserts that her compensation was not
commensurate with her education and professional experience.

scheme to wage-based sex discrimination claims brought under the Kentucky Civil Rights Act.)

The parties contest only two elements of the *prima facie* case: (1) whether Plaintiff was subjected to an adverse employment action, and (2) whether Defendant treated Plaintiff differently than similarly-situated individuals outside of the protected class. *See Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006).

### a. Adverse Employment Action

In the Title VII context, an adverse employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Lentz v. City of Cleveland*, 333 F. App'x 42, 57-58 (6th Cir. 2009).

Simply put, there can be no adverse employment action where Plaintiff's merit increases between 2012-2015 either significantly outpaced all or, in a single limited instance, fell slightly below

only one of her male comparators. The below brief graphic emphasizes this point:[14]

| Employee | Merit Increase 2012 | Merit Increase 2013 | Merit Increase 2014 | Merit Increase 2015 |
|----------|------------------|------------------|------------------|------------------|
| Ashley Allen | **$7,500.01** | **$4,000.00** | None | $3,511.96 |
| Timothy Bahorik | None | None | None | Not Applicable |
| Jason Hobson | $2,945.76 | $1,011.36 | None | $2,043.28 |
| Rizwan Zahoor | None | None | None | Not Applicable |
| Himanshu Garg | None | None | None | None |
| Gordon Shlegel | None | None | None | None |
| Ihab Abuelenein | $4,138.23 | None | None | None |
| James Dimapasoc | None | None | None | None |
| Anthony Holman | $1,860.00 | $948.60 | None | $1,916.36 |

---

[14] The graphic is drawn from Exhibit I of Defendant's Summary Judgment Motion (Doc. 35-1, PageID# 241.)

| Michael Howell | $6,531.00 | $1,996.62 | None | $2,036.35 |
|---|---|---|---|---|
| Eric Lanam | $5,462.00 | $4,250.00 | None | **$4,013.98** |
| Doug McKinley | $1,000.01 | $1,400.00 | None | None |

Accordingly, there was no adverse change in Plaintiff's employment status during the limitations period.

### b. <u>Comparison Between Similarly-situated Employees</u>

Plaintiff has produced evidence of eleven male employees who she alleges are comparators — ten subordinates and one alleged peer. Information related to these comparators' job responsibilities, salary, and performance evaluations are attached as a separate appendix (Appendix I), along with a chart related to these employees' merit-based increases.

However, Plaintiff cannot establish that she was similarly-situated to the eleven male comparators. To make such a showing, Plaintiff is obliged to present evidence that she was "similarly situated in all relevant respects." *Board of Regents v. Weickgenannt*, 485 S.W.3d 299, 308 (Ky. 2016) (citation omitted). That is, plaintiff must demonstrate that "all relevant aspects of [her] employment situation are nearly identical to those of the employees who [s]he alleges were treated more favorably." *Id.*

To prove that Plaintiff performed work that was "nearly identical" to her male comparators she must demonstrate that the performance of each job required equal skill, effort, and responsibility. *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981). Here, "skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing a job." *EEOC v. Universal Underwriters Ins. Co.*, 653 F.2d 1243, 1245 (8th Cir. 1981).

Applying this analysis, it is clear that Plaintiff was not performing work "nearly identical" to her male comparators. At the outset, Defendant coded Plaintiff's job as a Manager at the M-1 level during the limitations period in contrast to her male comparators who were coded as Professionals at the Specialist, Expert, and Master levels. While title distinctions are non-dispositive in determining whether employees are similarly-situated, the evidence is this matter demonstrates important distinctions between these various job functions.

By Plaintiff's own admissions, it is clear that her primary task was people management. Her position involved staffing North American time zone subordinates on projects and assessing their performance. (Doc. 40-4 at 880.) Likewise, her secondary

escalation management role primarily involved identifying and staffing team members with the requisite skill to address unexpected service outages. (*Id.* at 882.) Plaintiff testified that "she didn't do the technical work much at this point" and that she "would assist . . . but [ ] always made sure to have people involved because *the technical work was their responsibility*." (Doc. 40-1 at 649) (emphasis added.)

In contrast, Plaintiff's comparators were technical specialists with varying levels of expertise in information technology service delivery. For instance, Eric Lanam reported to Plaintiff during a portion of the limitations period and described himself as subject matter expert focused on running a particular technology. (Doc. 40-5 at 955.) Notably, Defendant subsequently promoted Lanam to a management escalation role and distinguished this role from his former position, noting that his primary task became "*managing* [ ] resources and escalating to off shift if needed." (*Id.* at 958) (emphasis added.)

Likewise, Professional-Experts Jason Hobson, Michael Howell, Himanshu Garg, Anthony Holman, James Dimapasoc, Gordon Schlegel, Rizwan Zahoor, Ihab Abuelenein focused on technical management and project work, core manufacturing, and various SAP systems respectively. (Doc. 40-1 at 653, 681-85, 686-87, 704, 706, 713, 715, 722, 723.) Professional-Specialist Timothy Bahorik was also

involved in the same type of technical work as his Expert counterparts, but he lacked their high level of technical mastery. (*Id.* at 720.)

Douglas McKinley deserves separate consideration from the above comparators as Plaintiff identifies him as a peer with the exception that Plaintiff managed more systems and subordinates. (*Id.* at 694) However, this characterization does not comport with the record. Chakkoria testified that McKinley was a subject matter expert who possessed authority in certain technologies and is described as having a "completely different role[]" when compared to Plaintiff.[15] (Doc. 40-4 at 887.) Moreover, Lanam testified that McKinley was a "senior architect, scripting resource" with a technical escalation skill set superior to Plaintiff. (Doc. 40-5, PageID# 943.)

Based upon this evidence, it is clear that Plaintiff was not similarly situated to these employees. Plaintiff's responsibilities vastly differed from those of her comparators in that she was responsible for personnel management rather than application of technical skills. Similarly, it is undisputed that skill differences existed between Plaintiff, her subordinates, and her self-identified peer. In sum, Plaintiff's employment

---

[15] This would explain McKinley's 28-Master rating identifying him as a technical expert.

responsibilities throughout the limitations period varied considerably from the male comparators, and plaintiff has thus not satisfied this prong of the *prima facie* case.

b. <u>Legitimate Non-Discriminatory Basis for Wage Disparity</u>

Assuming that Plaintiff had established a prima facie case of wage discrimination, Defendant nonetheless has demonstrated a legitimate non-discriminatory basis for any wage disparity based on its compensation scheme. Defendant acknowledges that its scheme involves a variety of factors that are taken into consideration when assessing an employee's performance:

> [A]ffordability of the company, how well the company did until the end of the year . . . The second factor would be how the individual did in their year in terms of their performance appraisal . . . Then the third is . . . where in the salary curve they are . . . it's natural if certain people, if they're maxed out in their salary curves, they would get nothing. If there are people who are lower down on the salary curves they would get the salaries, and then from time to time there are certain directives where the company can say there are no salary raises for [the] US."

(Doc. 40-3 at 850.) Additionally, "tenure; how you came into a company, local market conditions, retention, and attraction of local talent" make it impossible for all "your highest rated individuals would be the highest paid in the company." (Doc. 40-

6 at 993.)   It also strains logic to find that Defendant's compensation scheme was discriminatory where Plaintiff was the individual assessing her comparators and making critical decisions regarding the amount of their merit increases.

"Generally, a wage system which sets different grades for each position type and allocates a wage range is acceptable if the decisions are based on non-discriminatory factors." *Allen*, 1997 WL 579140 at *6; *see Cox v. Home Ins. Co.*, 637 F. Supp. 300, 304 (N.D. Tex. 1985) (upholding a complex compensation scheme devoid of discriminatory factors).  The above compensation factors do not include any discriminatory elements.   In fact, the number of variables would seem to prevent any discriminatory element from having a role in setting compensation.

For all these reasons, the Court concludes that plaintiff has failed to raise a triable issue on her claim for

Therefore, having reviewed this matter and considered the parties' arguments, and being sufficiently advised,

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. 33) be, and is hereby, **GRANTED**.  A separate judgment shall enter concurrently herewith.

This 7th day of September, 2018.



Signed By:

*__William O. Bertelsman__*

**United States District Judge**

| Employee Name: | Employee Title: | Management Level: | Subordinate/Peer to Plaintiff: | Job Description: | Rating(s): | Total Base Pay: |
|---|---|---|---|---|---|---|
| Ashley Allen | SVC-ITO Service Delivery | 1-Manager | Not Applicable | Complete performance evaluations of North American ERP team members and resourcing and staffing direct reports on applicable projects throughout the North American time zone. management Escalation Management | 2011: Significantly Exceeds Expectations 2012: Significantly Exceeds Expectations 2013: Significantly Exceeds Expectations 2014: Significantly Exceeds Expectations | 2011: $92,700 2012: $100,300 2013: $104,200 2015: $107,711 |
| Jason Hobson | SVC-ITO Service Delivery | Professional 15-Expert | Subordinate | Technical management and project work, core manufacturing, and various SAP systems | 2012: Exceeds Expectations 2013: Exceeds Expectations 2014: Exceeds Expectations | 2011: $98,191.97 2012: $101, 137.33 2013: $102,148.69 2015: $104, 191.97 2015: $120,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Eric Lanam | SVC-ITO Service Delivery | Professional 14-Master | Subordinate initially and then became Plaintiff's peer. | Project Management<br><br>Technical management and project work, core manufacturing, and various SAP systems | | 2011: 99,071.01<br><br>2012: 104,533,01<br><br>2013: 108,783.01<br><br>2015: $112,000<br><br>2015: $130,000 |
| Michael Howell | SVC-ITO Service Delivery | Professional 27-Master | Subordinate | Technical management and project work, core manufacturing, and various SAP systems | | 2011: $93,300<br><br>2012: $99,631.00<br><br>2013: $101,827.62<br><br>2015: $103,863.97 |
| Himanshu Garg | SVC-ITO Service Delivery | Professional 15-Expert | Subordinate | Technical management and project work, core manufacturing, and various SAP systems | 2011: Exceeds Expectations<br><br>2012: Exceeds Expectations<br><br>2013: Achieves Expectations<br><br>2015: Achieves Expectations | 2011: $109,141.65<br><br>2012: $109,141.65<br><br>2013: 109, 141.65<br><br>2014: $110,636.89<br><br>2015: $111,837.45 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Anthony Holman | SVC-ITO Service Delivery | Professional 15-Expert | Subordinate | Technical management and project work, core manufacturing, and various SAP systems | 2011: Achieves Expectations<br><br>2012: Exceeds Expectations<br><br>2013: Exceeds Expectations<br><br>2014: Achieves Expectations | 2011: $93,000<br><br>2012: $94,860<br><br>2013: $95,808.60<br><br>2015: $97,724.96 |
| James Dimapasoc | SVC-ITO Service Delivery | Professional 27-Master | Subordinate | Technical management and project work, core manufacturing, and various SAP systems | 2011: Achieves Expectations<br><br>2012: Achieves Expectations<br><br>2013: Achieves Expectations<br><br>2014: Achieves Expectations | 2011: $111,697.18<br><br>2012: $112,697.18<br><br>2013: $112,697.18<br><br>2014: $114,196.05<br><br>2015: $114,094.62 |
| Gordon Schlegel | SVC-ITO Service Delivery | Professional 15-Expert | Subordinate | Technical management and project work, core manufacturing, and various SAP systems | 2011: Exceeds Expectations<br><br>2012: Achieves Expectations<br><br>2013: Achieves Expectations<br><br>2014: | 2011: $95,000.04<br><br>2012: $104,500<br><br>2013: $104,500<br><br>2014: $109,504.80<br><br>2015: $108,500.30 |

| | | | | | Achieves Expectations | |
|---|---|---|---|---|---|---|
| Rizwan Zahoor | SVC-ITO Service Delivery | Professional 15-Expert | Subordinate | Technical management and project work, core manufacturing, and various SAP systems | 2011: Achieves Expectations<br><br>2012: Achieves Expectations<br><br>2013: Partially Achieves Expectations<br>2014: Partially Achieves Expectations | 2011: $109,188.24<br><br>2012: $109,188.24<br><br>2013: $109,188.24<br><br>2014: $109,188.24<br><br>2015: $109,188.24 |
| Timothy Bahorik | SVC-ITO Service Delivery | Professional 16- Specialist | Subordinate | Technical management and project work, core manufacturing, and various SAP systems | 2011: Achieves Expectations<br><br>2012: Achieves Expectations | 2011: $99,536.25 |
| Ihab Abuelenein | SVC-ITO Service Delivery | Professional 15-Expert | Subordinate | Technical management and project work, core manufacturing, and various SAP systems | 2011: Significantly Exceeds Expectations<br><br>2012: Significantly Exceeds Expectations<br><br>2013: Significantly Exceeds Expectations<br><br>2014: | 2011: $118,236.99<br><br>2012: $122,373.42<br><br>2013: $122,373.42<br><br>2014: $122,373.42<br><br>2015: $122,373.42 |

| | | | | | Exceeds Expectations 2015: Achieves Expectations | |
|---|---|---|---|---|---|---|
| Douglas McKinley | SVC-ITO Service Delivery | Professional 28-Master | Peer | Senior architect, scripting resource and involved in technical escalation with a skill set that was superior to Plaintiff's | 2011: Achieves Expectations 2012: Exceeds Expectations 2013: Exceeds Expectations 2014: Exceeds Expectations 2015: Achieves Expectations | 2011: $123, 183.40 2012: $124,183.41 2013: $125,583.41 2014: $130,606.84 2015: 129,602.08 |

## Merit Increase Comparison Graph

| Employee | Merit Increase 2012 | Merit Increase 2013 | Merit Increase 2014 | Merit Increase 2015 |
|---|---|---|---|---|
| Ashley Allen (Plaintiff) | $7,500.01 | $4,000.00 | None | $3,511.96 |
| Timothy Bahorik | None | None | None | Not Applicable |
| Jason Hobson | $2,945.76 | $1,011.36 | None | $2,043.28 |
| Rizwan Zahoor | None | None | None | Not Applicable |
| Himanshu Garg | None | None | None | None |
| Gordon Shlegel | None | None | None | None |
| Ihab Abuelenein | $4,138.23 | None | None | None |
| James Dimapasoc | None | None | None | None |
| Anthony Holman | $1,860.00 | $948.60 | None | $1,916.36 |
| Michael Howell | $6,531.00 | $1,996.62 | None | $2,036.35 |
| Eric Lanam | $5,462.00 | $4,250.00 | None | $4,013.98 |
| Doug McKinley | $1,000.01 | $1,400.00 | None | None |